STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

17-985 consolidated with 17-986, 17-987, 17-988,
17-989, 17-990, 17-991, 17-992

ROBERT J. BROUSSARD, ET AL.

VERSUS

MULTI-CHEM GROUP, LLC

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 118902
HONORABLE ANTHONY THIBODEAUX, DISTRICT JUDGE

**********

MARC T. AMY
JUDGE

**********

Court composed of Marc T. Amy, Van H. Kyzar, and Candyce G. Perret, Judges.

AFFIRMED.

Richard G. Duplantier, Jr.
Galloway, Johnson, Tompkins, Burr & Smith
701 Poydras Street, Suite 4040
New Orleans, LA   70139
(504) 525-6802
COUNSEL FOR DEFENDANTS/APPELLANTS:
    Multi-Chem Group, LLC
    Cade Bourque
    John Gauthier
    Nathan Walker
    Aaron Gauthier

**Theodore M. "Trey" Haik, III**
**Haik, Minvielle & Grubbs, LLP**
**Post Office Box 11040**
**New Iberia, LA   70562-1040**
**(337) 365-5486**
**COUNSEL FOR PLAINTIFFS/APPELLEES:**
    **Robert J. Broussard**
    **R. J. Broussard General Contractors, Inc.**

**AMY, Judge.**

The plaintiffs of numerous consolidated proceedings sought personal injury damages associated with alleged exposure to chemicals following an industrial explosion at the defendant chemical facility. With liability established in pre-trial proceedings, the matters proceeded to trial for consideration of the bellwether plaintiffs' respective individual claims. Following a multi-day proceeding, the trial court awarded each plaintiff general damages, including those for fear of developing cancer or other illness. The trial court also awarded medical expenses for some of the plaintiffs. The defendants appeal.

## Factual and Procedural Background

On June 14, 2011, a fire occurred at the facility of Multi-Chem Group, LLC in Iberia Parish, resulting in a series of explosions. Cade Bourque, Multi-Chem's Health, Safety, and Environmental Director at the time, confirmed that the facility housed 700,060 gallons of chemicals at the time of the fire and that the close proximity of its storage vessels contributed to multiple explosions.[1] Numerous individuals described the scene, explaining that they witnessed debris, including drums and containers, flying into the air due to those explosions.

---

[1] On cross-examination, Mr. Bourque confirmed that correspondence entered into evidence reflected that the "Volume of product onsite at time of fire = 700,060 gallons[.]"

When asked to describe the chemicals on site, he explained that the "vast majority of things on site were solvents, organic compounds. Things like methanol [were] probably the largest volume that we had there. Some alcohols, methanol, xylene. There were a lot of different products, but that made up the vast majority of the volume."

Email correspondence addressed to Mr. Bourque from the date of the fire reported that the "on hand inventory" of the facility on the date of the fire included a list of "the hazard band 'A' chemicals with the highest degree of hazard" as: Formic acid, Cyclohexylamine, HCL 31%, B-8650, Formaldehyde 37%, Zinc chloride solution, and Propargyl alcohol. Additional email correspondence provided the Material Safety Data Sheets (MSDS) for "Paraffin Inhibitor[,]" which according to the MSDS included "Xylene" and "Ethyl Benzyne" as "hazardous ingredients[.]" Mr. Bourque confirmed that this latter compound mixture was the product being blended at the time of the fire.

Prescott Marshall, the Director of the Office of Homeland Security and Emergency Preparedness for Iberia Parish Government, estimated that between five and ten fire departments responded to the scene, which ultimately came under the control of the Louisiana State Police. According to Director Marshall, authorities evacuated a one-mile area[2] surrounding the scene. The fire actively burned for 22-24 hours by varying accounts.

This matter was the first-filed of a number of suits[3] initiated after the occurrence, wherein the plaintiffs, workers at neighboring businesses and area residents, alleged that they were exposed to hazardous materials carried by smoke and wind. Multi-Chem was named as a defendant as were several of its employees. With the matters consolidated before the trial court, Multi-Chem's liability for resulting damages was established in pre-trial proceedings. Thereafter, the issues of causation and quantum of damages proceeded to a multi-day bench trial on a bellwether trial basis.[4] By stipulation, the parties chose bellwether plaintiff categories as follows:

---

[2] He stated that, at one point, a miscommunication resulted in the report of a five-mile evacuation zone.

[3] Given the consolidation, we address the matters collectively by this lead opinion and issue separate decrees in the respective consolidated appeals of: *Nicholas Hulin, et al. v. Multi-Chem. Group, LLC, et al.*, 17-986 (La.App. 3 Cir. _/_/18), _ So.3d _; *Nicole Gros, et al. v. Multi-Chem Group, et al.*, 17-987 (La.App. 3 Cir. _/_/18), _ So.3d _; *Clarisse Armstead, et al. v. Multi-Chem Group, LLC, et al.*, 17-988 (La.App. 3 Cir. _/_/18), _ So.3d _; *Rickey Mergist, et al. v. Multi-Chem Group, LLC, et al.*, 17-989 (La.App. 3 Cir. _/_/18), _ So.3d _; *Raymond Martin v. Multi-Chem Group, LLC, et al.*, 17-990 (La.App. 3 Cir. _/_/18), _ So.3d _; *Jeanna Schwing, etc., et al. v. Multi-Chem Group, LLC, et al.*, 17-991 (La.App. 3 Cir. _/_/18), _ So.3d _; and *K&J Supply, LLC, et al. v. Multi-Chem Group, LLC, et al.*, 17-992 (La.App. 3 Cir. _/_/18), _ So.3d _.

[4] The United States Fifth Circuit Court of Appeals has explained that:

> The term bellwether is derived from the ancient practice of belling a wether (a male sheep) selected to lead his flock. The ultimate success of the wether selected to wear the bell was determined by whether the flock had confidence that the wether would not lead them astray, and so it is in the mass tort context.

[1.]  Of those Plaintiffs who allege personal injury damages from exposure and who were located less than one (1) mile from the fire source, two (2) Bellwether Trial Representatives shall be jointly selected by Counsel for the Plaintiffs in the consolidated cases and two (2) Representatives shall be selected by Counsel for the Defendants.

[2.]  Of those Plaintiffs who allege personal injury damages from exposure and who were located between one (1) and three (3) miles form the fire source, three (3) Bellwether Trial Representatives shall be jointly selected by Counsel for the Plaintiffs in the consolidated cases and three (3) Representatives shall be selected by Counsel for the Defendants.

[3.]  Of those Plaintiffs who allege personal injury damages from exposure and who were located more than three (3) miles from the fire source, one (1) Bellwether Trial Representative shall be jointly selected by Counsel for the Plaintiffs in the consolidated cases and one (1) Representative shall be selected by Counsel for the Defendants.

For Category 1, counsel for the plaintiffs selected Ryan Maturin and Dodie Boudreaux as representatives whereas counsel for the defendants chose Rickey Mergist and Trey LeBlanc.  For Category 2 representatives, counsel for the plaintiff designated Sheral Iles, Julia Tillman, and Michael Honore, Sr., and counsel for the defendants chose Charles Antoine, Adam Curley, and Dorothy Lopez.  Finally, as representatives for Category 3, counsel for the plaintiffs

---

The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar. References to bellwether trials have long been included in the *Manual for Complex Litigation. See* MANUAL FOR COMPLEX LITIGATION § 33.27-.28 (3d ed.1995). The reasons for acceptance by bench and bar are apparent. If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts. Common issues or even general liability may also be resolved in a bellwether context in appropriate cases.

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997).

selected John R. Lopez, Sr., and counsel for the defendants chose Clarisse Armstead.[5]

At trial, the parties presented expert testimony on the remaining issue before the court, *i.e.*, whether the bellwether plaintiffs were exposed to hazardous materials as a result of the Multi-Chem fire and, as a result of that exposure, whether they sustained compensable damages. The plaintiffs presented the expert testimony of Dr. David Mitchell, a meteorologist, who opined that the smoke plume from the fire travelled in various directions, including the area south and southwest of the Multi-Chem facility.

Additionally, the plaintiffs presented Dr. Laura Plunkett, a toxicologist and pharmacologist, who opined that air sampling data[6] revealed that particulate matter existed for days following the fire and that those levels exceeded regulatory standards. She further explained that, while the air sampling data monitored volatile chemicals, it did not measure chemicals absorbed into the particulates. Given the materials involved, she explained that a "chemical soup of particulate[s]" resulted, with unknown properties.[7] She explained, however, that the type of acute symptoms complained of by the plaintiffs were consistent with exposure to particulate matter more than likely contained within the plume and that some of the associated chemicals are potential carcinogens.

---

[5] Per the parties' stipulation, the trial court's ruling resulted in a final judgment as to the bellwether plaintiffs, now subject of the present appeals, whereas trial for all remaining plaintiffs will proceed at a later date.

[6] Dr. Plunkett reported that, in reaching her opinion, she reviewed among other materials, air sampling data collected by CTEH, a Multi-Chem contractor. The record indicates that the CTEH data collection began approximately nine hours after the start of the fire.

[7] Dr. Plunkett explained that "[w]e know what an individual chemical does, but we don't know what the mixtures of the chemicals do. And so that's where this issue and the problem comes in when we talk about these kind of complex exposures with mixtures of chemicals."

Finally, the plaintiffs presented Dr. Monty Rizzo, who evaluated numerous plaintiffs, including two of the bellwether plaintiffs, and who explained that the type of acute injuries reported by those plaintiffs more likely than not resulted from their exposure. He identified potential problems with exposure to visible smoke as well as to smaller, invisible particulate matter.

In opposition, the defendants disputed Dr. Mitchell's testimony regarding the direction of the smoke plume, suggesting through the opinion of meteorologist Nash Roberts that the smoke plume travelled only in a north-northeast direction due to the direction of the wind. Finally, the defendants presented Dr. John Kind, as an expert in industrial hygiene, toxicology, and emergency response, who testified that there was no evidence of a potential for adverse health effects outside of the Multi-Chem facility. Dr. Kind concluded instead that the hazardous vapors involved in the fire were consumed in its heat and that there was no evidence that any of the hazardous chemicals were absorbed into the particulate matter. Further, given the direction of the smoke plume as suggested by Mr. Roberts, Dr. Kind suggested that the plaintiffs could not have come in contact with the particulates for such a period of time as to pose a risk.

Ultimately, the trial court rendered extensive written reasons upon a finding that each of those plaintiffs established exposure. The trial court awarded damages as follows:

**Category 1 (located less than one mile from the fire source)**

Ryan Maturin
Medical Expenses $539.75
General Damages $15,000.00
Mental Anguish (fear of developing cancer) $7,000.00

Dodie Boudreaux
Medical Expenses          $593.36
General Damages           $17,000.00
Mental Anguish (fear of developing cancer) $7,000.00


Rickey Mergist
Medical Expenses          $729.30
General Damages           $15,000.00
Mental Anguish (fear of developing cancer) $7,000.00


Trey LeBlanc
General Damages           $15,000.00
Mental Anguish (fear of developing cancer) $7,000.00

**Category 2 (located between one and three miles from the fire source)**

Charles Antoine
Medical Expenses          $742.37
General Damages           $15,500.00
Mental Anguish (fear of developing cancer) $7,000.00


Sheral Iles
Medical Expenses          $4,039.75
Lost Wages                $392.00
General Damages           $7,000.00
Mental Anguish (fear of developing cancer) $5,000.00


Julia Tillman
General Damages           $5,000.00
Mental Anguish (fear of developing cancer) $5,000.00


Michael Honore, Sr.
General Damages           $5,000.00
Mental Anguish (fear of developing cancer) $5,000.00


Adam Curley
General Damages           $5,000.00
Mental Anguish (fear of developing cancer) $5,000.00


Dorothy Lopez
Medical Expenses          $73.00
General Damages           $2,500.00
Mental Anguish (fear of developing cancer) $5,000.00

**Category 3 (located more than three miles from the fire source)**

John Lopez, Sr.
Medical Expenses          $239.75
General Damages           $2,500.00
Mental Anguish (fear of developing cancer)  $5,000.00

Clarisse Armstead
General Damages           $2,000.00
Mental Anguish (fear of developing cancer)  $2,000.00

The defendants appeal the resulting final judgment, assigning the following as error:

1)    The trial court erred in excluding the opinions of meteorologist Nash Roberts[.]

2)    The trial court erred in admitting and relying upon the opinions of meteorologist Dr. David Mitchell[.]

3)    The trial court erred in admitting and relying upon the opinions of Dr. Monty Rizzo[.]

4)    The trial court erred in admitting and relying upon the opinions of toxicologist Dr. Laura Plunkett[.]

5)    The trial court erred in finding that any Bellwether Plaintiff established general or specific causation[.]

6)    The trial court erred in finding that any Bellwether Plaintiff was entitled to damages for fear of future development of illness[.]

7)    The trial court erred in awarding excessive damage awards[.]

### Discussion

*Expert Opinion*

By their first four assignments of error, the defendants question the trial court's acceptance, and corresponding rejection, of certain opinion testimony offered by four experts. Louisiana Code of Evidence Article 702 is pertinent to these claims, providing that:

7

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(2) The testimony is based on sufficient facts or data;

(3) The testimony is the product of reliable principles and methods;  and

(4) The expert has reliably applied the principles and methods to the facts of the case.

The Louisiana Supreme Court has recognized that Article 702 now codifies *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 113 S.Ct. 2786 (1993), which addresses the methodology employed by prospective experts. *See Freeman v. Fon's Pest Mgmt., Inc.*, 17-1846 (La. 2/9/18), 235 So.3d 1087. Of course, a trial court is accorded broad discretion in its determinations of whether expert testimony should be admissible. *Cheairs v. State, Dep't of Transp. & Dev.*, 03-0680 (La. 12/3/03), 861 So.2d 536. With that standard in mind, we turn to each of the defendants' assignments of error relating to expert testimony, addressing the defendants' arguments by subject matter.

Meteorology

In their respective positions on whether plaintiffs were exposed to hazardous materials due to the fire, the parties presented conflicting versions of events as to the movement of air-borne material from the Multi-Chem site. As noted, the plaintiffs presented Dr. Mitchell who referenced radar imagery and wind direction in opining, in short, that within an hour of the initial fire and over the following day, smoke covered the area surrounding Multi-Chem exposing those in the subject areas to particulate matter from the explosion.

8

In contrast, the defendants presented the opinion testimony of meteorologist Nash Roberts. Mr. Roberts testified that, based on the wind direction throughout the period of the fire, the smoke plume consistently travelled only north-northeast of the Multi-Chem facility. Upon questioning, Mr. Roberts rejected Dr. Mitchell's interpretation of the radar images. While Dr. Mitchell found that those images depicted smoke from the explosion in areas beyond the northerly directions, Mr. Roberts suggested that the images depicted either clouds or false echoes.

The trial court accepted both witnesses as experts, qualifying Dr. Mitchell as an expert in forensic meteorology and air modeling,[8] and, in turn, Mr. Roberts as an expert in meteorology. However, in evaluating the witnesses' respective positions in its reasons for ruling, the trial court favored that offered by Dr. Mitchell. By their first two assignments of error, the defendants challenge the trial court's assessments of the experts' opinion and suggest that the trial court erred in "excluding" the opinion of Mr. Roberts and in "admitting and relying upon" that of Dr. Mitchell.

After review of Dr. Mitchell's pertinent credentials,[9] the trial court explained:

---

[8] The trial court qualified Dr. Mitchell as tendered. In presenting Dr. Mitchell's area of expertise, counsel tendered the meteorologist in forensic meteorology and "Modeling the direction and location of the plume and the extent to which that plume was to the south and the southeast in the most densely populated areas of New Iberia, miles to the south."

[9] The trial court related that:

> [Dr. Mitchell] has a doctorate in Meteorology from Purdue University, and has over thirty (30) years of experience in technical modeling in the industry and consulting. He has previously been qualified as an expert in Air Modeling and Forensic Meteorology by courts. He has extensive knowledge of forensic meteorology and has published his research results regarding the numerical modeling of atmosphere and convection. Dr. Mitchell is also a specialist in weather event reconstruction for litigation, and has provided expert testimony for numerous cases related to severe weather events and application of force majeure clauses. He has provided forensic meteorology support for civil and criminal

The Court finds that the opinions given by Dr. Mitchell in this case were based upon reliable scientific evidence, in that his testimony was based upon sufficient facts and data, his testimony was the product of reliable principles and methods, and he applied those principles and methods reliably to the [f]acts of this case. The court makes no such finding for Nash Roberts' testimony. Mr. Roberts refused to reveal the principles and methods that he used in forming his opinions on the basis that it was "proprietary". The court will therefore not consider Mr. Roberts' opinion.

Dr. David Mitchell reviewed and analyzed the weather conditions and wind patterns associated with the release of toxic smoke, particulate matter, and hazardous chemicals in the subject atmosphere as a result of the emissions from combustible sources from the June 14, 2011 explosions and fire at the Multi-Chem facility in New Iberia. He also considered case documents, photographs, and high resolution radar data and images produced by the National Weather Service from radar sites located in New Orleans and Lake Charles, Louisiana. Dr. Mitchell testified that the data showed that the skies were clear, absent of any clouds, at the time of the explosion. The radar images are high reflectivity images of dense matter, as opposed to cumulous clouds which are low density in nature. He also testified that the satellite imagery used does not reflect false echoes, and, if they did, it would render satellite imagery useless.

The radar images from the New Orleans based radar site show that, even though the winds were blowing from the west and southwest, within fourteen minutes of the first explosion, smoke was covering areas south, and heading southwest, of the explosion site. At 4:06 p.m., smoke was blowing west/northwest. There were also two other cloud-covered areas southeast of the explosion site, with the smoke clouds heading in an easterly direction. At 4:16 p.m., smoke clouds covered large areas in all directions of the explosion site, and the two clouds south/southeast of that site grew wider over the residential area located in the southeast while appearing to lessen in density. The National Weather Service's NEXRAD (radar site) at Lake Charles produced radar images that corroborated those satellite images produced by the New Orleans radar site, providing a broader view of the area of cloud coverage.

Dr. Mitchell does not dispute that eventually fire will create a vacuum that will draw all of the available smoke and particulate matter inward toward the center of the heat source and then rise to a

---

investigations, as well as insurance cases involving weather-related accidents, the release of toxic pollutants into the air, air pollution, and weather-related injury and property damages. Dr. Mitchell is a member of the Air and Waste Management Association, the American Meteorological Society, and the National Association of Environmental Professionals.

higher level and travel toward the direction that the winds are blowing (in this case, northeasterly). However, he did opine that initially, a fire storm such as this one creates its own microcosm that is not affected by prevailing winds and, in fact, is chaotic. It generates its own winds that will push smoke and particulate matter in the direction it causes. Eventually, the plumes rise and stabilize. Their paths are then dictated by prevailing wind direction and speeds at certain elevations, temperatures, and densities.

The photographs and radar images viewed by this court, along with the testimony of the witnesses located close to the explosion site, overwhelmingly support Dr. Mitchell's opinion and completely discredit Mr. Roberts' opinion. The court thus accepts Dr. Mitchell's opinion as fact that at least until 4:49 p.m. on the day of the incident, and presumably for a reasonable time thereafter, the hazardous chemicals listed in the abovementioned MSDS exploded and affixed themselves to the particulate matter in the smoke. That particulate matter, which measured at PM2.5 levels and PM10 levels and above, then entered the environment of the plaintiffs, exposing the plaintiffs to dosages of the hazardous chemical components.

This court finds that it [is] more likely than not that the particulate matter with standard measurements of PM2.5 is not detected by radar. Furthermore, as the particulate matter with standard measurements of PM10 or greater cooled, it became invisible as well to the radar images. The particulate matter then lingered in the environment of the plaintiffs for a sufficient amount of time such as to have caused the plaintiffs to sustain the injuries which they have reported.

As noted, the trial court did not credit Mr. Roberts' conflicting opinion. In addition to its reference to Mr. Roberts' proprietary method of formulating opinions, the trial court further remarked on his lack of post-graduate degree or certification. The trial court did, however, summarize Mr. Roberts' testimony in its reasons, noting that "Mr. Roberts opined that fire causes heat, and that heat creates a vacuum which travels upward and away." Referencing Mr. Roberts' evaluation of wind data from the area airport, the trial court noted that "Mr. Roberts testified that the smoke was heading in a north to northeasterly direction." However, the trial court found that Mr. Robert's opinion in that regard was contrary to photographic evidence. In particular, the trial court referenced a

11

photograph that it determined "shows the lower elevation smoke heading in an easterly direction toward K&J." The trial court further noted that witness testimony indicated "that K&J was covered in black smoke."

Specifically addressing Mr. Roberts' criticism of Dr. Mitchell's testimony regarding evidence of smoke on the radar data, the trial court explained:

> The radar imagery shows smoke clouds south of and then southwest of the explosion site shortly after the explosion. Mr. Roberts opined that those clouds were either cumulous clouds or "false echoes". Yet, he did not base that opinion on any weather report admitted as evidence which revealed cumulous clouds were present that day during the pertinent time period. Instead, Mr. Roberts identifies what he believes to be a cumulous cloud in a photograph that appears to be at a very low elevation.
>
> The court notes that the white cloud at issue is very similar in appearance to the white plume of smoke which manifested itself at the beginning of the explosions. Additionally, Defendants' exhibit 9 (fire department photographs) clearly show multiple plumes of smoke of various colors from white to gray to black forming and spreading throughout the area in different directions during the early stages of the incident.

The defendants pointedly contend that the trial court erred in concluding that Mr. Roberts did not reveal his methodologies due to their proprietary nature. They instead argue that "[t]he trial court misconstrued Roberts' testimony regarding the proprietary nature of his *commercial* methodology as justification for discarding the opinions that Roberts formulated in the context of the instant litigation."

However, the relevant testimony is not precise on this point. For instance, Mr. Roberts responded as follows upon questioning by plaintiffs' counsel:

> Q.    [W]hen you first were tendered, you talked about you used a proprietary secretive method for you to generate your reports. Is that correct?
>
> A.    I'm not saying this report but what we did on daily forecast to sell to our clients. If you selling [sic] something people aren't going to pay for it if you say it's not gonna rain and it rains or the seas are three feet and you can't get your guys off because their, the waves are

too high.  So you have to, you have to develop techniques from looking at the atmosphere, looking at the observations to make a forecast accurate.

Q.    Let me ask you this simple football question.  Did you use some of your proprietary techniques in generating the reports for Multi-Chem, your client?

A.    I used my over forty years of experience in daily weather forecasting and consulting and forensic work to develop that report.

Q.    Okay.  Could another meteorologist use your same techniques and come to the same conclusion you reached?

A.    If they had, if they were an applied meteorologist, somebody that was very familiar with daily weather, looking at observations, making a forecast to that and developing those skills, probably.

Q.    Probably.  But they still would need your proprietary techniques that you've developed over your forty-something years of doing this for commercial gain?

A.    I would think that would be awful helpful to them.

Q.    Okay.  So they couldn't follow you is what, what I'm trying to get at.  They, they couldn't follow in your footsteps without this proprietary information that you've gathered over the years?

A.    Personally, I don't think so.

Q.    Okay.

A.    It's possible.

BY THE COURT:
    You got secret methods you [sic] using?

BY [COUNSEL FOR THE PLAINTIFFS]:
    That's what I'm saying, Your Honor.

BY THE WITNESS:
A.    I have years and years of experience, fought out what'[s] wrong and figured the right way.

Q.    You don't have shared methods?

A.    What's that?

13

Q. You're not using methods that are shared with other meteorologists?

A. No. I'm sorry?

Q. You're not using methods that are shared with the other meteorologists in the community?

A. No unless they came through my office.

As the defendants observe, the general availability of the underlying *data* is clear. Yet, as demonstrated by the lack of clarity in the above passage, the record supports the trial court's exercise of discretion in questioning the reliability of methodology employed in arriving at his opinion in this matter. *See* La.Code Evid. art. 702 (providing that an expert witness may testify in opinion form if, in part, their "testimony is the product of *reliable* principles and methods" and that he or she "has reliably applied the principles and methods to the facts of the case."). *See also Freeman*, 235 So.3d at 1090 (emphasis added) (noting that La.Code Evid. art. 702 codifies *Daubert*, 509 U.S. 579, which, in turn, "concerns the *methodology* employed by the experts").

Turning to consideration of the defendants' corresponding suggestion that the trial court erred in accepting Dr. Mitchell's opinion, it is clear that the trial court's reasons reflect its further assessment of the experts' respective opinions rather than a determination strictly under the standards of La.Code Evid. art. 702. Recall that both witnesses were qualified as experts. Only after that qualification, and upon consideration of their conflicting views, did the trial court place greater weight on that offered by Dr. Mitchell. To the extent we evaluate that decision here, it is important to recall that a factfinder's decision to credit the testimony of one witness over that of another "can virtually never be manifestly erroneous." *Snider v. La. Med. Ins. Co.*, 14-1964, p. 5 (La. 5/5/15), 169 So.3d 319, 323. That

"rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony." *Id.* In fact, "'[t]he only time [the trial court's decision to accept the opinion of one expert and to reject that of another] will be deemed manifestly erroneous is when the court was clearly wrong in accepting the expert's opinion on which it relied.'" *Veroline v. Priority One EMS*, 13-865, p. 3 (La.App. 3 Cir. 2/12/14), 153 So.3d 1050, 1052 (quoting *Tullis v. Rapides Parish Police Jury*, 95-905, p. 8 (La.App. 3 Cir. 1/17/96), 670 So.2d 245, 250). On that latter point, we find no abuse of discretion in the trial court's acceptance of Dr. Mitchell's opinion.

The defendants suggest that Dr. Mitchell's opinion regarding the direction of the smoke plume was unreliable due to the lack of reference to wind direction data from the regional airport or to photographic and video imagery which the defendants assert demonstrate that the smoke plume moved only in a northerly direction. However, extensive questioning of Dr. Mitchell undermines that position as he was questioned on the emphasized wind evidence. In particular, he explained that "as soon as the fire begins, it creates its own microclimate with turbulence. So we don't know. It's what we call, in meteorology, chaos. It's a chaotic situation that can't be modeled or defined by ordinary meteorological equations or principles." Specifically, with regard to the importance of the wind data from the Acadiana Regional Airport,[10] Dr. Mitchell explained:

> Once the fire has lofted up and got the heated particulate in the air, the surface winds can be very chaotic. They can move it to the south. Now here's the important part, though. Once this falls back down, then and if it falls back down out here where you pointed out at Center Street and East St. Peter Street, then those winds may take over and it's going to move it right back across the neighborhood. Those

[10] Testimony indicated that the airport is located approximately a mile from the Multi-Chem facility.

eleven-mile-an-hour winds you keep talking about at the airport, once it reaches the surface, those winds away from the fire could push it right back. That's what I call in my report a double whammy, or in my deposition. They're not only when it moves to the south and levels out, then the eastern winds from the Acadiana measurements can take those same particulates and move them back across the neighborhood.

Dr. Mitchell was further questioned on his interpretation of photographic evidence. The trial court was able to assess his responses in its ultimate acceptance of his opinion. Accordingly, we find neither abuse of discretion in the trial court's reliance thereon nor manifest error in its placement of greater value on the testimony of Dr. Mitchell than that of Mr. Roberts.

Similarly, we find no merit in the defendants' questioning of that aspect of the trial court's ruling as to the chemical composition of the plume.[11] While the defendants contend that Dr. Mitchell was unqualified to testify as to the plume's "composition" as he is not a toxicologist, Dr. Mitchell's testimony reveals that he denied that he was offering an opinion in that regard. Rather, and in addition to the direction of the plume, Dr. Mitchell spoke to the concentration of particles contained within or outside of the smoke plume, doing so, in part, upon questioning by defense counsel. Dr. Mitchell responded as follows upon questioning regarding the composition of the plume:

---

[11] The defendant complains of that aspect of the written reasons for ruling wherein the trial court explained that:

> The photographs and radar images viewed by this court, along with the testimony of the witnesses located close to the explosion site, overwhelmingly support Dr. Mitchell's opinion and completely discredit Mr. Roberts' opinion. *The court thus accepts Dr. Mitchell's opinion as fact that at least until 4:49 p.m. on the day of the incident, and presumably for a reasonable time thereafter, the hazardous chemicals listed in the abovementioned MSDS exploded and affixed themselves to the particulate matter in the smoke.* That particulate matter, which measured at PM2.5 levels and PM10 levels and above, then entered the environment of the plaintiffs, exposing the plaintiffs to dosages of the hazardous chemical components.

(Emphasis added.)

16

Q.    You're not a toxicologist …, are you?

A.    That's correct.

Q.    So you're not rendering an opinion about the contents of this plume; is that correct?

A.    That's right.

Q.    You're not an expert in rendering an opinion about what regulatory levels that plume that you discussed in the radar, if those – if that plume ever exceeded a regulatory level; is that correct?

A.    That's correct.

While the trial court invoked Dr. Mitchell's opinion in its finding regarding hazardous components of the plume, reference to both the testimony and the ruling, as a whole, reflect that the toxic nature of the subject materials was drawn from other expert witness testimony, specifically the parties' toxicology experts.

This assignment lacks merit.

Otolaryngology – Dr. Monty Rizzo

The defendants next question the trial court's acceptance of Dr. Monty Rizzo, a board certified otolaryngologist, as an expert. Dr. Rizzo examined eighty of the prospective plaintiffs upon referral by counsel. Those plaintiffs included bellwether plaintiffs Ryan Maturin and John Lopez. However, the defendants question whether Dr. Rizzo should have been allowed to testify due to what they contend is a lack of academic or research history in toxic tort injury. The defendants further urge that the trial court should not have considered his testimony as, they contend, he failed to perform an adequate differential diagnosis in reaching his conclusion that the plaintiffs' symptoms more likely than not resulted from the Multi-Chem fire.

We first address the defendants' assertion that the trial court "committed legal error in admitting [Dr.] Rizzo's testimony as a qualified medical professional in the treatment of toxic tort injuries." Their focus, here, on the "toxic" nature of the chemicals involved does not call into question the trial court's acceptance of Dr. Rizzo's testimony in the accepted field of "ear, nose, and throat." In fact, when the trial court questioned whether the defendants objected to the plaintiffs tender of Dr. Rizzo's expertise, defense counsel responded: "No objection." There is no merit to the argument that the trial court could not thereafter consider the physician's opinion, within that accepted field, due to the alleged toxicity of the alleged exposure. Dr. Rizzo explained that in arriving at his conclusions, he reviewed both the list of chemicals involved in the fire and the report of Dr. Plunkett, the plaintiffs' expert in the fields of toxicology and pharmacology.

In this regard, the trial court observed that Dr. Rizzo utilized the materials of other expert witnesses in forming his opinion following his examination of the subject plaintiffs, explaining that:

> [Dr. Rizzo] reviewed a list of chemicals that were associated with the case, and the symptoms associated with exposure to such chemicals. He also reviewed written reports generated by Dr.'s David Mitchell and Laura Plunkett. He considered the plaintiffs' histories of exposure to the chemicals, as well as their complaints and symptomology. The court finds that Dr. Rizzo is qualified as an expert ear, nose, and throat specialist who can give his opinion on persons exposed to the chemicals that were involved in the explosion at the Multi-Chem facility.
>
> Dr. Rizzo testified that the smaller the particulate matter, such as particulate matter that measured PM2.5, the greater the chance it has of entering the nasal cavities and traveling to the lungs, thus causing the greater risk of potential harm to the person exposed. Dr. Rizzo opined that those patients whom he examined in connection with this litigation were exposed to the chemicals involved in the Multi-Chem facility explosion in sufficient dosages and duration as to have caused the complained-of injuries.

The Court accepts Dr. Rizzo's opinion as its finding.

We find no abuse of the trial court's discretion in that acceptance. Specifically, the trial court referenced Dr. Rizzo's educational and professional credentials and recognized his utilization of outside expert opinion. The trial court was further aware of defense counsel's cross-examination regarding Dr. Rizzo's examinations of numerous patients as well as his considerations and determinations.

Neither do we find merit in the defendants' assertion that Dr. Rizzo was unqualified to offer a medical causation opinion due to the perceived limitations of his examinations of the plaintiffs. Specifically, the defendants contend that "[a] doctor submitting a medical causation opinion in a toxic tort case is required to perform a differential diagnosis to rule out other causes." In doing so, the defendants reference *Keener v. Mid-Continent Casualty*, 01-1357, p. 11 (La.App. 5 Cir. 4/30/02), 817 So.2d 347, 354, *writ denied*, 02-1498 (La. 9/20/02), 825 So.2d 1175, wherein the fifth circuit stated: "A review of Louisiana cases shows that physicians' use of differential diagnosis is usual and customary to evaluate a patient's symptoms, and a physician's failure to employ this method to arrive at a diagnosis has been found to breach the standard of care."[12] While we do not

---

[12] While defendants reference *Keener* for the quoted proposition, the fifth circuit case was not a toxic tort case and, instead, involved an allegation that a plaintiff's stroke was caused by lumbar surgery necessitated by an underlying automobile accident.

The defendants further cite *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269 (5th Cir. 1998), *cert. denied*, 526 U.S. 1064, 119 S.Ct. 1454 (1999), for this point. Although *Moore* was a toxic tort action, the trial court excluded an expert's testimony regarding causation. Contrarily in the present case, the trial court accepted the expert's opinion. And, as here, the Fifth Circuit reviewed the trial court's ruling pursuant to an abuse of discretion standard, before maintaining the trial court's exclusion upon a finding that "the district court did not abuse its discretion in finding that the "'analytical gap'" between Dr. Jenkins's causation opinion and the scientific knowledge and available data advanced to support that opinion was too wide." *Id.* at 279.

Further attenuated, and ultimately unpersuasive given the circumstances of this case, is the defendants' advancement of *Jenkins v. Slidella, LLC*, No. 05-370, 2008 WL 2649510 (E.D. La. June 27, 2008), *aff'd*, 318 Fed.App'x. 270 (5th Cir. 2009). Critically, *Jenkins* is a district

19

question that statement, we conclude that it simply does not dictate the result sought by the defendants. First, this is not a case involving a breach of the standard of care as the defendants' reliance on the quoted passage would seemingly suggest. Second, the trial court in *Keener*, as here, accepted the treating physician's testimony regarding causation. Rejecting the defendants' contention that the expert witness "used improperly the methodology of 'differential diagnosis'[,]" the fifth circuit ultimately determined that the trial court "did not err" in admitting the physician's testimony. *Id*. at 354, 355. We find the same in this case.

Further, while the defendants assert that Dr. Rizzo's opinion must be disregarded due to limitations in his testing, the transcript provides better context to Dr. Rizzo's actual involvement as an expert in this case, as well as the type of symptoms on which he was commenting. He specifically spoke of the two bellwether plaintiffs he evaluated, Ryan Maturin and John Lopez, each of whom he saw once and both of whom he referred for a chest x-ray. Dr. Rizzo explained that Mr. Maturin complained of coughing, sore throat, headaches, sinus pain and pressure, burning in the eyes, and nose bleeding, whereas Mr. Lopez presented with complaints of eye irritation, burning of the eyes, and excessive tearing. Given

court's resolution of a motion in limine regarding the exclusion of testimony of expert witnesses rather than an appellate court's review under an abuse of discretion standard when no such motion was filed. Additionally, the district court's ruling in *Jenkins* does not provide the fine point of law argued by the defendants. The defendants' brief in this court suggests that the district court "excluded the opinions of the plaintiff's medical expert specifically because he failed to perform a differential diagnosis" and that "[t]he court found that the physician 'asserts a causal relationship based merely upon a temporal relationship between alleged exposure and the occurrence of symptoms.'" Citing *Jenkins*, slip op. at 6. However, reference to that quotation indicates that it is contained within a passage addressing the defendants' argument. Without speculating as to the parameters of the district court's ruling in *Jenkins*, by which the defendants challenged the proposed expert in various respects, we note that the trial court succinctly determined that: "Defendants' motion in limine should be granted and that the testimony of [the physician] as to medical causation should be excluded as it fails to pass muster under *Daubert*." *Id.* The trial court in the present case made no such finding.

those symptoms and upon cross-examination as to his orders for testing and whether he rendered a diagnosis, Dr. Rizzo explained:

> Q   Did you render any sort of diagnosis or opinion at the time that you saw these individuals?
>
> A.   Render a diagnosis?
>
> Q.   Yes.
>
> A.   Basically, no.  I rendered a report.
>
> Q.   Okay.  And those reports were basically what these individuals should do, going forward, with their treatment?
>
> A.   It was basically a history of what they had symptom-wise, physical exam-wise.  And I would give them a verbal recommendation, you know, if they needed to – like the gentleman with the eyes, you know, put him on the Blink drops.  And I would tell them, if these symptoms persisted, they would need to be followed up.
>
> . . . .
>
> Q.   With respect to your opinions on exposure to the Multi-Chem fire that you talked about with Mr. Haik today, isn't it correct that you haven't done any additional testing or examination or anything else to rule out any additional or alternative causes to support those opinions?
>
> A.   Well, I didn't order any extra tests, because I didn't feel it would be productive.  We could have done pulmonary function studies and other things of that [sic], but that would have been contingent on patients having a continuation or increasing symptoms.  And that would be more falling in the realm of their treating physicians that they already had.

Given the larger context as well as the fact that the trial court was informed, by cross examination, of arguable limitations of Dr. Rizzo's evaluations given the symptoms reported, we maintain the trial court's acceptance of that testimony.

Toxicology – Dr. Laura Plunkett

In their final challenge to the plaintiffs' experts, the defendants question the trial court's reliance on the opinion testimony of Dr. Plunkett.  Accepted by the

trial court as an expert in the fields of toxicology and pharmacology, Dr. Plunkett testified regarding chemicals of concern contained at the Multi-Chem facility and opined that the plaintiffs' complaints were consistent with exposure to substances contained within the fire plume. She further opined that they were more likely than not caused by that exposure. However, the defendants contend that Dr. Plunkett is not qualified to render the type of opinion offered and that she further based her opinion on unreliable methodology. We review these arguments in turn.

In reviewing Dr. Plunkett's credentials, the trial court explained that:

> Dr. Laura Plunkett is a board certified toxicologist and pharmacologist in applied toxicology in assessing human risk exposed to environmental matter. She describes pharmacology as the study of chemicals on the human body, and toxicology as the study of the harm that chemicals have on the human body. Epidemiology focuses on the effects of chemicals on the population in the community. While Dr. Plunkett does not have any earned degrees in epidemiology, she does use it as a tool in her work. A toxicologist provides a more targeted approach on a community than an epidemiologist. Dr. Plunkett has qualified in the past as an expert to assist the courts in determining what chemicals were in fires, assessing whether there exists sufficient information to make health assessments, and determining what types of exposure one would expect to find. She has also testified as an expert many times on behalf of defense law firms in these types of cases.

Absent from the trial court's above statement is detail regarding Dr. Plunkett's credentials. Dr. Plunkett's testimony, as well as reference to her curriculum vitae reveal that, in addition to having earned a Ph.D. in pharmacology, Dr. Plunkett served as a fellow with the National Institutes of Health and as an assistant professor with the University of Arkansas for Medical Sciences, where she had separate appointments in the departments of pharmacology and toxicology. She explained that after leaving academia she began working in the field of applied pharmacology and toxicology, acting as a consultant. Since 1997 she has operated her own consulting company in Houston. Dr. Plunkett testified that she had been

22

published numerous times, listing thirty-three such publications on her CV. Dr. Plunkett confirmed that those publications related to both fields of expertise.

Yet, the defendants suggest that Dr. Plunkett was unqualified to offer expert testimony on the risks associated with this industrial fire because much of her work has addressed toxicity issues related to products regulated by the Food and Drug Administration. Notwithstanding that aspect of Dr. Plunkett's practice, however, her experience supports the trial court's determination. Dr. Plunkett confirmed that she had been accepted in courts nationwide as an expert in toxicology, as well as human health risk assessment, and that she had further previously considered the impact of fire in other industrial chemical release cases. In their brief, plaintiffs' counsel directs this court to three of Dr. Plunkett's publications addressing toxicity and risk assessment. Furthermore, it is unclear how Dr. Plunkett's lack of specific expertise in some areas, such as epidemiology, otherwise detracts from her expertise in the qualified fields. Instead, Dr. Plunkett's broad-ranging work encompassed some of the areas in which the defendants express concern.[13]

Neither do we find merit in the defendants' second contention that Dr. Plunkett's opinions were based on unreliable methodology as she was unable to testify regarding the plaintiffs' actual exposure and whether the plaintiffs experienced adverse health effects from the fire. The defendants further note that Dr. Plunkett did not conduct her own air sampling, but that she instead relied on air

---

[13] For instance, the defendants question Dr. Plunkett's lack of expertise as an epidemiologist. Dr. Plunkett confirmed that, although not an epidemiologist "by training, … [i]t's a tool I use." Furthermore, when asked whether she had "done any scholarly research in epidemiology" or had "released any treatises or articles on epidemiology[,]" Dr. Plunkett explained: "Not in [a] general sense, although I have done some health risk studies in populations, for example, in Frisco, Texas, which was an epidemiological investigation. And I've also designed and assisted in the performance of clinical trials which are a type of epidemiological investigation."

sampling data collected by Dr. Kind[14] and that she, in turn, misinterpreted that data. On this point, the defendants advance Dr. Kind's criticism of Dr. Plunkett's use of that data as well as of her reliance on certain safety standards.

Yet, both Dr. Plunkett and Dr. Kind were questioned before the trial court regarding the differences in their interpretation of the data. Dr. Kind was specifically questioned regarding his criticisms of Dr. Plunkett's approach, including his assertion that Dr. Plunkett failed to appreciate that his air data testing included measurement of the type of smaller particulate matter that Dr. Plunkett testified was of increased concern.[15]

---

[14] The record indicates that the plaintiffs engaged Dr. Plunkett for purposes of litigation, whereas Multi-Chem engaged Dr. Kind's employer, CTEH, in response to the ongoing fire. The trial court reviewed that history as follows:

> Dr. Kind arrived in New Iberia approximately seven hours after the initial explosion. Upon arriving, he began to install air monitoring devices designed to detect chemical hazards in the air that reach a health hazard standard of PM10 and above. He placed these monitors on the explosion site and northeast of [the] site because that is where the plume originated and was heading at the time of his arrival. He also put a very limited amount of air sampling monitors southeast of the explosion site in the residential area where most of the plaintiffs resided.

> Dr. Kind testified that all of the hazardous chemicals at issue burned away in the fire. He also testified that if the hazardous chemicals affixed themselves to the smoke particles, they were vacuumed inward toward the fire and drifted up in a plume away from the plaintiffs, heading in a northeasterly direction toward Spanish Lake. Dr. Kind further testified that if a person did not see the smoke that carried the chemicals, then they were not exposed to the chemicals. Finally, he testified that if the plaintiff[s] were exposed, the dosage and duration of such exposure was so limited that it could not cause any injuries to the plaintiffs. Dr. Kind also disputed that hazardous chemicals can be harmful at PM2.5.

> Yet, the data obtained by the air monitoring samplers installed by Dr. Kind in the neighborhood located southeast of the explosion site had readings higher than the PM10 standard. Some were noted to be PM30 and PM40. Also noted is that those readings were based upon data obtained at least seven hours after the initial explosion, or six hours after the smoke was located over that area.

> The Court finds that Dr. Kind's opinion that the plaintiffs were not exposed to the subject hazardous chemicals in amounts which exceeded regulatory safe standards is based on inaccurate and contrary information. The Court also finds that the plaintiffs were exposed in sufficient dosages and duration to sustain injuries associated with the chemicals at issue.

[15] Along this line, Dr. Rizzo further testified that:

24

Critically, the defendants' continued argument here incorporates and requires the acceptance of Dr. Kind's testimony, particularly his criticism of Dr. Plunkett's interpretation of the data he collected on behalf of Multi-Chem. However, the trial court's ruling reveals its contemporaneous acceptance of Dr. Plunkett's testimony and its favorable consideration of that testimony over that offered by Dr. Kind. The court explained:

> The factual information that Dr. Plunkett reviewed and considered consisted of the chemicals stored at the explosion/fire site as listed in the MSDS, photographs of the explosion site and the surrounding area, regulatory standards for risk levels of the chemicals located at the explosion site, symptoms associated with exposure to the chemicals at issue, the plaintiffs' complaints and symptoms, Dr.'s David Mitchell's and John Kind's written reports, description of the fire and CTE[H] data, and the report of the air sampling gathered more than seven hours after the initial explosion. She indicated that there was sufficient information to aid her in concluding whether the plaintiffs were exposed to the subject chemicals.

> The court finds that Dr. Plunkett's scientific, technical, and specialized knowledge will assist the trier of fact in understanding the evidence and determining facts at issue. She is qualified as an expert, and her opinion may be considered by the court in determining the likelihood that any plaintiff may have been exposed to the subject chemicals and the likely health effects that such exposure would have caused. The court finds that the scientific evidence provided by Dr. Plunkett is reliable after considering the testability of her theories, whether her theories have been subjected to peer review and publication, and whether the methodologies used by her are generally accepted in the scientific community. *It is noted that the court makes no such findings for Dr. John Kind's opinions.*

---

The smaller the particulate matter, the more likely it is going to be able to go deeper into the pulmonary structures and impact into the small bronchioles and bronchial sacs. Larger material can be trapped in the nasal cavity and up in the upper airway, and it's not as likely to make it all the way down to the bronchial sacs.

Dr. Rizzo further stated that: "[T]he smaller the particle, the easier it would be to evade being entrapped in the upper airway and would go through the trachea down the bronchial tubes into the smaller air sacs and air passages. So smaller in this case sometimes is more lethal than bigger."

The court is convinced by the scientific evidence introduced at trial that particulate matter measured at PM2.5 is invisible to the naked eye and radar and may, in fact, be more dangerous to exposed persons who are more sensitive than particulate matter measured at PM10 or higher. The court also believes that some particulate matter measured at PM10 may gradually become invisible to the naked eye and radar as its temperature and density decreases, yet it will still linger in the areas where the plaintiffs were located.

The court does accept Dr. Plunkett's opinion that the plaintiffs who were complaining of the symptoms associated with exposure to the chemicals located at the site of the explosion/fire were more probably than not exposed to those chemicals in sufficient dosages for a sufficient duration in order to cause them the injuries that they allege to have sustained. The court accepts that opinion as a finding of fact when considering all of the evidence presented in this case.

(Emphasis added.)

Notably, the defendants do not separately assign as error the trial court's rejection of Dr. Kind's opinions.[16] Further, and outside of Dr. Kind's testimony, the defendants do not point to objective indicia of unreliability in Dr. Plunkett's

---

[16] As recognized by the defendants, the trial court recognized that Dr. Kind was "imminently qualified," however it gave lesser weight to his opinion. Dr. Kind explained that he acted as the lead toxicologist of the response team to the Multi-Chem fire. He and his team arrived at the site that evening, launching their response by around midnight. In addition to air sample monitoring conducted by LDEQ at the site, Dr. Kind and his team also began sampling air, soil, and water. Dr. Kind explained that air sampling, in particular, was conducted for fifty days. Following extensive questioning regarding the air monitoring findings, counsel for the defendants pointedly inquired whether he identified "any evidence that individuals had the potential to suffer adverse health effects outside the confines of the Multi-Chem site[.]" Dr. Kind responded that he did not and explained:

I looked at the testing data that we have. I look at the observations and testing that LDEQ did. I looked at the photos and videos of the fire, used my experience from responding to previous fires. A situation like this when you have a very hot fire, again, that smoke and fires entrained in that smoke column, it's a hot fire. The smoke rises from the location to a high altitude, is blown downwind and disburses some miles downward. And, and that's what happened here. We did also take readings, you know, from the actual smoke plume itself, at a latter time. Again, that evening, that night when we got there, you don't have the heat. You do have the smoke down on the ground. You have a condition, then, when you don't have really intense fires, you're actually more likely at that time to have smoldering and incomplete combustion which can give you the chemicals and byproducts in the air. So we, we took samples, we did monitoring in that actual smoke and, again, didn't see anything besides really particulate matter in the smoke there. So, you know, the data that I look at all together, these lead me to the conclusion that, you know, nobody would've had harmful smoke exposures from this, this incident.

testimony regarding her own interpretation of the data collected under Multi-Chem's initiative. We leave the trial court's consideration of that testimony undisturbed.

*Causation*

Turning from their assignments regarding the qualification of the witnesses, the defendants question the trial court's determination that the bellwether plaintiffs established causation of their alleged injuries. In particular, the defendants contend that Dr. Mitchell's and Dr. Plunkett's testimony was theoretical in nature, failing to adequately demonstrate that the plaintiffs were likely exposed to any substance capable of causing adverse health effects. The defendants further contend that, again given the allegedly theoretical nature of those experts' testimony, the plaintiffs failed to establish causation of any specific plaintiffs' alleged injuries.

In *Bradford v. CITGO Petroleum Corp.*, 17-296 (La.App. 3 Cir. 1/10/18), 237 So.3d 648, *writ denied*, 18-0272 (La. 5/11/18), 241 So.3d 314, a panel of this court addressed a plaintiff's burden of proof as to causation in a toxic tort personal injury suit. Explaining that such proof in a toxic tort matter has two components—general causation and specific causation—the panel stated that: "'General causation' refers to whether a substance is capable of causing a particular injury or condition in the general population, while 'specific causation' refers to whether a substance caused a particular individual's injury." *Id*. at 559. Importantly, "[a] plaintiff cannot sustain his or her burden of proof with general causation proof alone; the plaintiff must also establish specific causation." *Id.* We consider each in turn, noting that a trial court's determination as to causation is one of fact and is subject to the manifest error standard of review. *Id*.

General Causation

The defendants first argue that the plaintiffs failed to establish general causation, doing so by again questioning Dr. Plunkett's testimony and asserting that she was the only expert witness presented by the plaintiffs who addressed general causation. They argue that Dr. Plunkett offered only a hypothetical scenario that was not grounded in fact on the issue of whether the matter emanating from the explosion was capable of causing adverse health effects. The defendants point out that Dr. Plunkett acknowledged that air sampling did not reveal hazardous chemical levels exceeding regulatory guidelines. Thus, they suggest, there is no evidence that such chemicals survived the intensity of the fire or attached themselves to particulate matter. The defendants further contend that there is no evidence indicating that any exposure by the particulate matter, alone, posed a risk of injury as reported by the plaintiffs.

As above related, Dr. Plunkett expressed her view that the chemicals involved in the fire posed a risk by their adherence to and absorption into the particulate matter emanated from the fire. Too, and as advanced by the defendants, Dr. Plunkett testified to the absence of air sampling data indicating that the particulate matter included a chemical component. Referring to the air sampling conducted by Dr. Kind at Multi-Chem's request immediately following the fire, she explained that "unfortunately all we have are readings of particulate, not chemical analysis of what that particulate actually contained or what it actually looked like." She stated that her focus was on the "chemical mix within that particle load." However, on the issue of risk posed, as relevant to the inquiry of general causation, Dr. Plunkett repeatedly opined as to the potential of injury, stating at one point that:

28

It's the idea that it's well established that particulate matter as well as matter with these kinds of chemicals adsorbed, which make them more reactive, will lead to exactly those types of situations that would be a variety of acute effects, things seen very soon after exposure that you've just listed. And they would be ones that would also be consistent with the monitoring data that we do have. Unfortunately, I don't have data everywhere. But, of the data I do have, the levels that we're seeing are high enough to fit into that category of producing an acute respiratory or eye or dermal reaction.

Further, and as discussed below with regard to the award for fear of future development of cancer, Dr. Plunkett testified that some of the chemicals at issue "potentially could be carcinogenic." When asked whether the absorbed chemicals could lead to future injuries, Dr. Plunkett explained:

A. Yes. And that actually is described within the government treatises that talk about particulate matter. Some of the issues with particulate matter, especially ones where there's a chemical mix with the particulate, there's fear. There's issues for potential carcinogenicity. There's issues for potential immune system abnormalities. There's the issue of adverse cardiovascular health consequences in the future.

As noted, the trial court accepted Dr. Plunkett's testimony regarding the risk posed by the fire's emissions. While the defendants focus on the limits of Dr. Plunkett's reference data in this assignment, as they further do in support of their argument regarding specific causation, it is important to remember that the data was generated under the defendants' direction and was at their control. Although it did so in response to a spoliation claim lodged by the plaintiffs, the trial court remarked on the paucity of data in the reasons for ruling, explaining that:

The court finds that Multi-Chem and CTE[H] were grossly negligent toward the plaintiffs and the community of New Iberia for failing to adequately monitor the air quality in the areas that were in fact affected by the explosion and fire, as opposed to the one area that provided Multi-Chem with the best defense in this case.[17]

---

[17] The trial court further explained that:

In their reply brief, the defendants assert that because the trial court made no reference to spoliation in its causation analysis, reference to that consideration is inappropriate. We find no merit in that assertion, instead noting that a panel of this court in *Anthony v. Georgia Gulf Lake Charles, LLC*, 13-236, p. 8 (La.App. 3 Cir. 5/21/14), 146 So.3d 235, 248, *writ denied*, 14-2102 (La. 11/26/14), 153 So.3d 425, affirmed a finding of causation in a hazardous chemical exposure matter and, in part, excerpted the trial court's conclusion that:

> [The defendant] made a deliberate and/or grossly negligent decision prior to, during and after, the explosion and resulting fire, to make sure there was minimal, if any, air monitoring outside of the plant in the most populated and heavily traveled areas closest to the Georgia Gulf plant, which made it impossible for Plaintiffs, or anyone else, to determine the amount of the multiple hazardous chemicals to which the public may have been exposed. The only air monitoring performed off-site by Georgia Gulf was away from the more populated areas, which was performed by untrained employees, who, in spite of their lack of training, obtained readings that were indicative of a high level of chemicals in the air.

The trial court found similarly in this case.

Accordingly, given Dr. Plunkett's statement regarding the potential risk posed by the involved chemicals and the particulate matter, along with the

---

The court also finds that Multi-Chem deliberately destroyed available dirt samples before Plaintiffs' experts could conduct tests. Multi-Chem first authorized Plaintiffs to remove dirt samples for testing, but then prohibited them from doing so before such tests could be conducted. Multi-Chem then removed all dirt and other residue via remediation, deliberately spoliating the evidence before Plaintiffs had a reasonable opportunity to obtain an order allowing them to remove dirt samples on which to conduct their tests. Such conduct allowed Multi-Chem to completely control the relevant data which was assessed and submitted to the LDEQ, which was the result of Multi-Chem's own investigation and findings. It was this data and investigative findings which LDEQ relied upon in its report of the incident and its aftermath. As a result, the plaintiffs and citizens of New Iberia may never know the truth of what chemicals they may have been exposed to.

Nonetheless, the court notes that despite Multi-Chem's efforts, there remained a mountain of evidence available for use by Plaintiffs to support their claims, and thus, they have suffered no spoliation-of-evidence damages.

limitations on the data available for her review, we find that the record supports the trial court's determination that the plaintiffs proved general causation.

Specific Causation

We turn to consideration of the defendants' contention that jurisprudence anticipates that, in sustaining his or her burden of proving specific causation, each plaintiff must offer an analysis of the dose and duration of their exposure. The defendants further contend that the plaintiffs were required to prove that a differential diagnosis of each plaintiff was performed so as to determine that the purported health effects were more likely than not caused by the exposure. Having earlier addressed the latter, we turn to the defendants' remaining argument.

As briefly addressed above, the plaintiff in a toxic tort suit has the burden of proving that the offending substances caused his or her injury. *Bradford*, 237 So.3d 648 (citing *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347 (5th Cir. 2007); *Berzas v. Oxy USA, Inc.*, 29,835 (La.App. 2 Cir. 9/24/97), 699 So.2d 1149). In *Arabie v. CITGO Petroleum Corp.*, 10-2605, p. 19 (La. 3/13/12), 89 So.3d 307, 321, the supreme court framed the issue of causation as "whether the plaintiff proved through medical testimony that it was more probable than not that subsequent injuries were caused by the accident." The supreme court further analyzed the causation issue before it upon consideration of the plaintiffs' testimony regarding the circumstances of their symptoms upon exposure, along with expert opinion and medical records. *Id.* While the defendant in *Arabie*, 89 So.3d at 322, asserted that "plaintiffs were required to prove exposure by means of scientific evidence such as air monitoring data[,]" the supreme court rejected that argument and explained:

> We find instructive our holding in the case of *Edwards v. Sawyer Industrial Plastics, Inc.*, 99-2676 (La.6/30/00), 765 So.2d 328. That worker's compensation matter involved a plaintiff who had been exposed to styrene fumes in the workplace over a period of about eighteen months. The plaintiff introduced both lay and expert testimony, including that of fellow workers who testified as to their symptoms while in the workplace, and that of an expert in internal, occupational, environmental and forensic medicine, who testified that the plaintiff's symptoms were consistent with exposure to toxic chemicals. The worker's compensation judge found that the plaintiff suffered from an occupational disease and was permanently and totally disabled. The court of appeal reversed, holding that the plaintiff had failed to meet his burden of establishing that his disabling condition was caused by exposure to toxic chemicals on the job. This Court, in turn, reinstated the worker's compensation judge's decision, on the basis of the lay and expert testimony, and in spite of the absence of "scientific evidence" as to the level of exposure. Here, as in *Edwards*, there is substantial evidence supporting the trial court's determination that plaintiffs' injuries were caused by exposure to toxic chemicals contained in the slop oil, even though that determination is not supported by air monitoring data.

Subsequently, and referencing *Arabie*, the supreme court explained that a plaintiff may meet his or her burden of proving causation by either a quantitative *or* qualitative assessment of exposure. *Freeman*, 235 So.3d 1087.

Additionally, and specific to the defendants' argument regarding dose and duration, a panel of this court rejected that argument in *Anthony*, 146 So.3d 235. The panel explained that the defendant argued that "'[t]here is no proof in this case, testimonial or otherwise, that any particular plaintiff was, *in fact*, exposed to any particular chemical, for any particular period of time, at any particular concentration (dose) from the Georgia Gulf site.'" *Id*. at 246. The panel further explained that "Georgia Gulf asserts the respective trial courts were 'persuaded' to 'equate the *possibility* of exposure with proof of *actual* exposure.'" *Id.* However, the panel found no merit in that argument. Upon reference to the prior circuit opinion in *Arabie,* the panel remarked that: "Similar to this case, the precise amount of that chemical released into the community was not known, but there

32

were clear, statistically significant health problems in the exposed residents that mirrored the type of health problems suffered by the plaintiffs here." *Id.* at 249 (citing *Arabie v. CITGO Petroleum Corp.*, 10-244 (La.App. 3 Cir. 10/27/10), 49 So.3d 529, *writ granted*, 10-2605 (La. 2/4/11), 56 So.3d 981, *aff'd in part, rev'd in part*, 10-2605 (La. 3/13/12), 89 So.3d 307).

As in prior cases, the plaintiffs' experts in this case offered their opinion in the face of limitations in the available data. However, the plaintiffs presented testimony regarding the amount and nature of chemicals stored at the facility at the time of the explosion. The trial court further had available to it Dr. Mitchell's testimony regarding his opinion that the smoke plume generated by the explosion travelled in all directions from the facility rather than merely the north, northeast direction as urged by the defendants. When asked whether he had "reached an opinion about whether or not the smoke plume traveled to the south of the Multi-Chem plant into the most densely populated areas of New Iberia[,]" Dr. Mitchell responded that: "[I]t did. It moved in that direction over the city and over the area that's densely populated."[18]

Turning to the nature of the chemicals involved and, again the effect of exposure, Dr. Plunkett stated:

> Q. If a plaintiff testifies that she was – tasted or smelled the plume – smoke and chemicals – or chemicals – and that soon thereafter felt nauseous or suffered headaches or had sinus and respiratory complications or had eye irritation, skin – dermal irritation, would

---

[18] He further opined that:

> I might also point out that the plume that the radar is seeing, the particulates had to be a certain size. There's a tremendous amount of finer material that the radar can't see that's caught in that same plume moving to the south. So, although it may be sparse on the radar as far as the blobs that are moving, those are just the most tightly dense particles. But the whole plume contains particulate matter from 2.5 microns and lower all the way up to big chunks of material that are floating in the atmosphere.

those types of complications be consistent with the data that you've seen, the literature that you've reviewed, and your experience that you have regarding the impact of particulate matter and absorbed mixtures of chemicals on people?

A.     Yes, absolutely.   I mean, that's the, I think, the discussion we've been having.   It's the idea that it's well established that particulate matter as well as matter with these kinds of chemicals adsorbed, which make them more reactive, will lead to exactly those types of situations that would be a variety of acute effects, things seen very soon after exposure that you've just listed.   And they would be ones that would also be consistent with the monitoring data that we do have.   Unfortunately, I don't have data everywhere.   But, of the data I do have, the levels that we're seeing are high enough to fit into that category of producing an acute respiratory or eye or dermal reaction.

When questioned as to whether she had "done a specific dosage duration analysis for certain people," Dr. Plunkett denied that such an analysis was possible and stated:

A.     Because – well, first, we don't have data at every location we would need to have it in order to do that.  If you look at that map and you see where the monitoring was, it was mainly right on some of the major roadways just outside the plant.   It wasn't in – on the map where you see homes located or where people would have been living. We don't even have data for the first – really good data for the first seven hours.  We have some data three hours that LDEQ took, but they were not out here in these areas that you would need to see where people are living.  And then based upon Dr. Mitchell's description of where the plume went, that is all consistent with those areas being impacted.  And I don't have the data to show that.  So I wish I did, but I don't.

Q.     But just to be clear – I think we did this in the first part of the qualifications – but do you think that that dosage duration analysis is necessary for you to opine with regard to what is more likely than not?

A.     No.    And that's because of the levels that we see were monitored.  And even days afterwards, a couple of days afterwards, we're still seeing significant levels that exceed some of the regulatory standards.  So again it's the idea that the time period of highest impact wasn't monitored, wasn't monitored where it needed to be monitored. And then those things together – again, to me as a toxicologist, this really is – the hazard and the risk can be defined just based on what we're missing unfortunately when we know that in the first hours of the burning, that's when we're going to get the hottest fire, we're

going to get the majority of the chemicals being burned off. So the particles that are coming off are the ones that are going to have the adsorbed chemicals to it. And that is also consistent with the CTEH report that shows that there were zones around the plant that, you know, you see, you know, the particles traveling out away. It isn't just right at the – right at the plant in the boundaries within the fences where the facility was located.

Additionally, each of the plaintiffs testified regarding their experience in the aftermath of the explosion, some of whom testified regarding the smell and taste of the fire as well as the irritating nature of their respective injuries related to the exposure. *See Arabie*, 89 So.3d at 321 (wherein the supreme court referenced the plaintiffs' testimony regarding their "contemporaneous and near-contemporaneous symptoms" upon exposure to the odors and fumes involved in that suit in its discussion of the specific causation burden of proof). Finally, and in addition to the medical records of some of the plaintiffs who pursued medical attention, the trial court was informed by Dr. Rizzo's opinion as to causation of the injuries reported by the plaintiffs he evaluated.

Considering the totality of this expert and lay testimony, we find no merit in the defendants' contention that the plaintiffs failed to demonstrate specific causation.

*Fear of Developing Cancer*

In their next assignment of error, the defendants question the trial court's awards for fear of developing cancer[19] to each of the bellwether plaintiffs. Pointing out that the awards ranged from $2,000.00 to $7,000.00, the defendants contend that the plaintiffs failed to offer sufficient expert opinion regarding the carcinogenic properties of the chemicals involved and that some of the plaintiffs

---

[19] We point out that the defendants styled the assignment of error as one addressing "fear of future development of illness[.]" However, this analysis considers the award as one for "fear of developing cancer" as reflected in both the judgment and in the trial court's reasons for ruling.

offered no testimony regarding their fear of cancer. We here consider the sufficiency of the expert testimony, but defer consideration of each plaintiffs' testimony for inclusion in the discussion of damages below.

By this assignment, the defendants reference *Bonnette v. Conoco, Inc.*, 01-2767 (La. 1/28/03), 837 So.2d 1219, for the proposition that "Louisiana courts do not recognize a cause of action for increased risk of future injury when the potential for the occurrence of future injury is speculative or merely 'possible.'" However, given the facts of this case, we find the appropriate framework for review is better addressed in *Arabie*, 89 So.3d at 322-23, wherein the supreme court explained:

> In its fourth assignment of error, CITGO argues that the lower courts failed to follow this Court's jurisprudence in awarding damages for fear of future injury, citing this Court's opinion in *Bonnette v. Conoco, Inc.*, 01-2767 (La.1/28/03), 837 So.2d 1219, for the proposition that fear of future injury must be supported by a showing that the alleged fear is more than speculative or merely possible. CITGO claims that there is no such evidence. Plaintiffs argue, on the other hand, that *Bonnette* is inapposite to the present matter, as it dealt with damages for mental anguish in the absence of physical injury, which are present here.
>
> In *Bonnette*, the plaintiffs were exposed to a *de minimis* amount of asbestos, a known cancer-causing substance. This court reversed the lower courts' rulings that the plaintiffs were entitled to damages for the fear of developing asbestos related cancer, citing the holding in *Moresi v. State, Dept. of Wildlife & Fisheries*, 567 So.2d 1081 (La.1990). That case held that a defendant will not be held liable where his conduct is merely negligent and causes only emotional injury unaccompanied by physical injury. *Bonnette*, 837 So.2d at 1234, 2001-2767 La. 23-24. The *Bonnette* court, distinguished its holding from that in *Anderson v. Welding Testing Laboratory, Inc.*, 304 So.2d 351 (La.1974), recognizing that fear of contracting cancer, when accompanied by physical injury, as has occurred in the instant matter, is compensable.
>
> Here, each plaintiff testified to a fear of contracting cancer in the future as a result of his exposure to the toxic chemicals contained in the slop oil for a period of weeks. As we said in *Anderson*, "While to a scientist in his ivory tower the possibility of cancerous growth

may be so minimal as to be untroubling, we are not prepared to hold that the trier of fact erred in finding compensable this real possibility to th[ese] worrying workmen." *Anderson*, 304 So.2d at 353.[20] We find that the lower courts did not err in awarding plaintiffs damages for fear of future injury.

As in *Arabie*, 89 So.3d 307, the bellwether plaintiffs in this case asserted that they sustained physical injury, with most[21] additionally testifying as to their fears for the future. Thus, we find that the higher burden of proof advanced by the defendants, and addressed in *Bonnette*, is inapplicable here. In *Fontenot v. CITGO Petroleum Corp.*, 17-924, p. 2 (La.App. 3 Cir. 5/23/18), _ So.3d _, _ (citing *Broussard v. Olin Corp.*, 546 So.2d 1301 (La.App. 3 Cir. 1989)), a panel of this court recently confirmed that "a plaintiff bringing a fear of injury claim must show a possibility that the injury at least could happen in the future."

Reference to Dr. Plunkett's testimony supports the trial court's award for this category. When asked whether "the types of chemicals absorbed in the particulate matter [are] carcinogens, Dr. Plunkett responded:

> A. They have some properties, some of them, that indicate they potentially could be carcinogenic. But unfortunately we don't have clear studies on these mixtures, and that's the problem. The regulatory agencies talk about this all the time for cancer hazard. We know what an individual chemical does, but we don't know what the mixtures of the chemicals do. And so that's where this issue and the

---

[20] The supreme court rejected the defendant's argument regarding the compensability of the fear of future injury as follows:

> We find, for instance, no warrant for the intermediate court to disregard as noncompensable the fear with which the plaintiff lives every day that the condition in his hand might start spreading and he might have to lose his fingers. While to a scientist in his ivory tower the possibility of cancerous growth may be so minimal as to be untroubling, we are not prepared to hold that the trier of fact erred in finding compensable this real possibility to this worrying workman, faced every minute of his life with a disabled and sometimes painful hand to remind him of his fear.

*Anderson*, 304 So.2d at 353 (exhibit citation omitted).

[21] We below address those plaintiffs separately who did not offer such testimony.

problem comes in when we talk about these kind of complex exposures with mixtures of chemicals.

When subsequently asked whether "these chemicals that were also likely absorbed into the particulate matter include properties that have the potential to lead to future injuries[,]" Dr. Plunkett explained:

> A.   Yes.   And that actually is described within the government treatises that talk about particulate matter.  Some of the issues with particulate matter, especially ones where there's a chemical mix with the particulate, there's fear.  There's issues for potential carcinogenicity.  There's issues for potential immune system abnormalities.  There's the issue of adverse cardiovascular health consequences in the future.

Given the trial court's acceptance of that testimony, as well as its corresponding rejection of Dr. Kind's opposing testimony, we do not find merit in the defendants' contention that the plaintiffs' failed to offer adequate expert opinion regarding the plaintiffs' possibility of future injury.

*Damages*

Finally, we turn to the defendants' argument that the trial court's award of damages to each bellwether plaintiff was excessive and unsupported.  Given their common geographical distance from the Multi-Chem facility and the intensity of the fire, we take the defendants' arguments out of turn and address the plaintiffs by category.

**Category 1 (located less than one mile from the fire source)**

Ryan Maturin

On the day of the fire, Mr. Maturin was employed at Thomas Tools, a facility adjacent to Multi-Chem, and was working in a building approximately fifty yards from Multi-Chem when he heard the explosion.  He explained that "it felt like the whole ground was shaking."  Mr. Maturin described seeing thirty-five to

fifty-five gallon drums flying "at least 200 feet in the air[,]" and "the Multi-Chem building start to melt." Gathering his crew, the employees ran to an initial muster point and then proceeded to retreat on foot to various evacuation points. Mr. Maturin further stated that he could feel the heat from the fire, which he described as smelling strongly. He testified that the scene was chaotic and that it was "probably the most scared" he had been in his life. Upon returning to his facility three weeks later, Mr. Maturin suffered nausea for at least two weeks due to what he explained was a strong, distinguished smell of ammonia.

As for injuries, Mr. Maturin reported that, on the day of the fire, his eyes were very irritated and that he suffered severe headaches for three to four months, nose bleeds for two months, and congestion which continued until the time of trial. Mr. Maturin reported to two physicians, including Dr. Rizzo, who testified at trial regarding Mr. Maturin's complaints and his opinion regarding causation.

The trial court awarded $539.75 in medical expenses incurred "as a result of his exposure to the particulate matter and chemicals" and $15,000.00 in general damages upon a finding that "due to Mr. Maturin's close proximity to the Multi-Chem facility at the time of the explosions and fire, he was reasonable in fearing for his safety." The trial court further noted Mr. Maturin's exposure to the "smoke from the fire which carried particulate matter and chemicals, thereby exposing him to those chemicals in sufficient dosage and duration to cause the injuries he sustained." Finally, upon a finding that Mr. Maturin had "a credible fear of developing cancer in the future due to his close proximity and direct exposure to the smoke" the trial court awarded $7,000.00 for fear of developing cancer.

After review, we leave these awards undisturbed. Given his proximity to the events described and the resulting complaints, which the trial court credited, both

39

the award of medical expenses and general damages are supported by the record. While the defendants note that Mr. Maturin denied having been "directly in the smoke from that fire" nor having contact with the resulting particulate matter, his testimony indicates exposure insofar as he suffered eye irritation, felt the heat from the fire and smelled an odor emanating from the scene. We find no abuse of the trial court's discretion in this regard. *See Purvis v. Grant Parish Sch. Bd.*, 13-1424, p. 7 (La. 2/14/14), 144 So.3d 922, 928 (citation omitted) (providing that "[t]he initial inquiry, in reviewing an award of general damages, is whether the trier of fact abused its discretion in assessing the amount of damages. Only after a determination that the trier of fact has abused its 'much discretion' is a resort to prior awards appropriate, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion.").

We similarly find support for the trial court's award for fear of developing cancer given Mr. Maturin's proximity to the site and his testimony that, although he did not have knowledge of the exact chemicals stored at the Multi-Chem facility, but that "we were told that they had chemicals over there that can – you know, that were very dangerous, that can kill you" and that he has "a fear of maybe catching cancer in the future or anything from it."

We therefore maintain the award to Mr. Maturin.

Dodie Boudreaux

Ms. Boudreaux was also an employee of Thomas Tools, working in a building that she described as being twelve feet from the Multi-Chem facility. She explained that the fire produced multiple explosions and that she "thought an eighteen wheeler had hit the building." Ms. Boudreaux further stated that she was "[k]nocked" into the file cabinets and that the employees "didn't know what was

going on." Upon being told to evacuate by managers who entered the building, Ms. Boudreaux and fellow employees convened at an initial muster point and then continued on foot to a location approximately one mile from the facility. She explained that the fire produced black smoke and that it emitted a nauseating smell. She explained that: "Our eyes were burning. Some of the ladies had contacts that they were trying to get out of their eyes." Ms. Thomas testified that there were objects in the air and that she was "scared that we would be hit by them, so we just started running. It was hot. It was very hot." She explained that she thought "we were going to die because of all the explosions we can hear."

Ms. Boudreaux testified that she immediately experienced eye irritation, coughing, and that she suffered a nose bleed until she reached the muster point. Like Mr. Maturin, Ms. Boudreaux testified to experiencing nausea and headaches, including upon her return to work several days after the explosion. She described the smell as intensifying during the months-long demolition of the Multi-Chem facility. Ms. Boudreaux sought medical attention for chest tightness and headaches and that she was ultimately diagnosed with anxiety. She explained that she now worries, "even with hearing fireworks or loud noises. I'm just kind of jumpy, agitated and just – I didn't have any of these health issues before the explosion. So it's very worrisome. And I do have the fear of developing cancer."

Noting Ms. Boudreaux's proximity to the explosion, and finding that she had a reasonable fear for her safety, the trial court awarded Ms. Boudreaux $17,000.00 in general damages, as well as $593.36 in incurred medical expenses. The trial court further explained that since certain "chemicals burned in the fire were carcinogens, and considering the fact that Ms. Boudreaux has since developed nodules on her thyroid, the court finds that Ms. Boudreaux has a

41

credible fear of developing cancer in the future due to her close proximity and direct exposure to the smoke." It awarded her $7,000.00 in that regard.

As with Mr. Maturin, we maintain the trial court's award. While the defendants suggest that Ms. Boudreaux should not be awarded general damages due to the failure of her medical records to reveal treatment for physical injuries due to fire, we find no merit in that argument. Rather, Ms. Boudreaux testified extensively regarding physical injury and, in turn, the mental anguish associated with the experience, including her fear of developing cancer. The trial court found Ms. Boudreaux credible in her reporting, a finding we find supported.

Rickey Mergist

Mr. Mergist explained that, upon hearing the explosion, he and co-workers ran from their office at Thomas Tools toward Multi-Chem. However, they stopped running after seeing the building in flames and immediately began evacuating others from the building. Like Mr. Maturin, Mr. Mergist stated that he saw containers flying into the air. When asked whether he knew the extent of what was happening, Mr. Mergist explained that he "knew there was an explosion taking place and it was very intense at that point in time for us to get out of there." He stated that he had concerns for his life while running "because not knowing which way these containers were flying up in the air. Once I got out the front of the building, every explosion I heard, I stopped, turned just to see where they were going, make sure it wasn't coming in the direction that I was running." Mr. Mergist described feeling "an intense amount of heat" from the fire and that he began smelling an odor. He stated that the odor persisted at the site for a month.

Mr. Mergist reported that he immediately experienced eye irritation and coughing, but that he did not initially seek medical treatment. However, he

explained that after seven days he continued to feel unwell. He reported shortness of breath, a rash on his forearms that persisted for some time, coughing, and an itching throat. The trial court credited that account, although it noted a lack of evidence that further complaints of back pain and stroke were causally related to the accident. The trial court awarded $729.30 in medical expenses related to his exposure at the site and $15,000.00 in general damages due to his reasonable fear for his safety. While the defendants contend that Mr. Mergist failed to support his claim of actual exposure, we again reject that argument given the above discussion of expert testimony as well as Mr. Mergist's testimony regarding his sensory impressions of the events. We further find that the record supports the award of $7,000.00 due to fear of developing cancer. Mr. Mergist specifically testified that he had health concerns, including a fear of developing cancer, particularly after hearing the evidence regarding the involved chemicals.

Trey LeBlanc[22]

Mr. LeBlanc, the final bellwether plaintiff of Category 1, testified that he was at his desk at K&J Supply when the explosion occurred. He described the business as being located across the street from the Multi-Chem facility and that, upon hearing the explosion, he and other employees ran to the front door, panicking. He described those employees as panicked and frightened. Like the plaintiffs from Thomas Tools, Mr. Leblanc testified that barrels and tanks were involved in the explosion. While he denied detecting an odor initially, he explained that when Multi-Chem employees opened the door of the building, he

---

[22] Counsel for Mr. LeBlanc filed an appellee's brief with this court stating that "[a]ll claims on behalf of Trey A. LeBlanc have been settled and therefore any appeal regarding these claims should now be considered moot and removed from the Court's docket." However, the record contains no indication of such a post-judgment settlement by Mr. LeBlanc. Neither has Mr. LeBlanc filed a motion to dismiss the appellant's appeal in that regard. Given that lack of documentation, we provide review of the appellants' argument.

observed a harsh, toxic smell. He described smoke coming into the building at that time. Mr. LeBlanc reported that, upon evacuating the building, "[t]here was lots of heat, lots of smoke, lots of chemical intake and smell." He also explained that he could taste "the chemical that we were smelling." When asked to describe the particles in the air, Mr. LeBlanc stated that "maybe the ashes were falling. Particles – bigger particles, like drums and stuff was [sic] falling." He explained that the debris was of concern to him as he was afraid it would fall on the 1,000 gallon propane tank housed on the site, possibly causing further explosion.

When asked about the impact of the fire, Mr. LeBlanc explained that he experienced burning of the eyes, nose, and throat for several days afterward. He denied experiencing nausea, but explained that he coughed for "a couple of days" and that he had headaches for "a couple of weeks[.]" When asked about the future, Mr. LeBlanc testified that he had fear of "[t]he long-term effects of the chemical inhalation, cancer, other sicknesses that could evolve later on down the line."

The trial court credited Mr. LeBlanc's account, awarding $15,000.00 in general damages, finding that due to his "close proximity to the Multi-Chem facility at the time of the explosion and fire, he was reasonable in fearing for his safety. Furthermore, he was exposed to the smoke from the fire which carried particulate matter and chemicals, thereby exposing him to the chemicals." The trial court further noted that Mr. LeBlanc suffered stress and anxiety due to his business's temporary relocation following the incident. Finally, the trial court awarded Mr. LeBlanc $7,000.00 for mental anguish from fear of developing cancer, again observing his proximity to the fire and smoke.

We maintain the trial court's award here. While the defendants suggest that Mr. LeBlanc's reporting of the scene and panic associated with the explosion was

contradicted by surveillance footage of the facility, we point out that the trial court viewed that footage before ultimately crediting Mr. LeBlanc's account. We do not disturb that credibility assessment or factual finding here.

**Category 2 (located between one and three miles from the fire source)**

Charles Antoine

Of the Category 2 plaintiffs,[23] Mr. Antoine was in closest proximity to the explosion insofar as he was at work at Thomas Tools and was located in its building closest to the Multi-Chem facility. He explained that he heard multiple explosions and that, as the employees were evacuating, he saw smoke coming into the building. Mr. Antoine described his own evacuation and explained that after he and other employees saw further explosion, fire, and smoke, they became frightened and ran to two further evacuation points. He noted that they ran because "[i]t was coming fast. It was, like, everything was happening so fast. We had to start running." He testified that he felt the heat of the fire, and that there was a strong, chemical smell. He explained that the smell intensified during the demolition of the Multi-Chem facility, producing coughing and vomiting.

Mr. Antoine described various immediate physical effects, including difficulty breathing, eye irritation, dizziness, and nausea. When asked if there were further effects upon exiting the building, he explained that his "chest was hurting and stuff. It was like it was happening so fast." Mr. Antoine stated that he did not initially seek medical treatment as he thought the problems would resolve. However, he sought assistance after approximately two months. By that time his

---

[23] The judgment reflects that Mr. Antoine was included within Category 2 by designation of the parties. However, his testimony indicates that, like three members of the Category 1, he was employed at Thomas Tools.

primary complaints were scratchy throat, nausea, and chest burning. Mr. Antoine reported that his symptoms began to resolve, that his breathing has never been the same and that he still has a headache on occasion, as well as a scratchy throat. When asked if he had concerns going forward, Mr. Antoine explained that "inhaling the chemicals and stuff, I had thought that I would later on catch cancer or something." He explained that he had been told that such an occurrence was a possibility and that it has caused worry.

The trial court credited Mr. Antoine's accounting and awarded $742.37 in medical expenses and $15,500.00 in general damages due to his exposure and his injuries of approximately three months. The trial court further found Mr. Antoine's fear of developing cancer credible given the carcinogenic nature of some of the materials involved, awarding him $7,000.00 in that regard. We find no abuse of discretion in the trial court's shaping of the award. The defendants suggest that Mr. Antoine's testimony regarding smoke entering his building is contradicted by other testimony. However, his testimony regarding the smoke was only one small aspect of his testimony. Given the magnitude of the events and the emergency presented by the situation, which was corroborated by other witnesses, the variation in eye witness testimony regarding the presence of visible smoke on the scene does not undermine the trial court's finding.

Sheral Iles

Ms. Iles explained that she was inside her trailer home at the time of the explosion and that she went outside after receiving a telephone call from her sister to "go outside and see all the smoke." She explained that, once outside, she "couldn't see nothing but black smoke or whatever it was." Describing the smoke, she explained that there "was a lot of black smoke. And the wind [was] blowing.

And tell you the truth, I thought it was coming directly where all the mobile homes were, tell you the truth." Ms. Iles explained that she smelled a strong odor, which made her dizzy, drowsy, and produced a headache as well as a dry mouth. She denied having these symptoms before breathing the smoke. Evacuating the neighborhood with her neighbors, Ms. Iles stayed overnight with her mother and visited the hospital the following day. She reported her symptoms as well as her concern regarding having been exposed to the possible chemical exposure and was, in turn, diagnosed with uncontrolled hypertension, dizziness, and giddiness. Ms. Iles explained that she was feeling better by her follow-up visit in October 2011. Ms. Iles reported that, during the time she was ill, however, she was unable to work as a caregiver. When asked about her fears, Ms. Iles explained that the occurrence was frightening and that she sometimes has difficulty sleeping.

Unlike the previously discussed plaintiffs, and noting that Ms. Iles lived 2.67 miles west/northwest of the facility, the trial court concluded that she "was not close enough in proximity to have reasonably felt any immediate threat to her safety." It further explained that she "testified at trial that she was never in the smoke. However, she was close enough to see the smoke coming towards her trailer park, and the expert testimony introduced at trial supports the claim that it came over her home." Thus, the trial court concluded that "Ms. Iles was exposed to the particulate matter and chemicals carried by the plume of smoke[.]" Recognizing the defendants' contention that her symptoms were possibly caused by pre-existing conditions, the trial court explained that "the fact that her symptoms occurred immediately following her exposure leads the court to believe that they were more probably than not caused by such exposure, whether or not they were new symptoms or simply the aggravation of her pre-existing

47

conditions." Given these factors, the trial court awarded Ms. Iles $4,039.75 in medical expenses, $7,000.00 in general damages, and $392.00 in lost wages.

We maintain those awards. While the defendants suggest that Dr. Kind's testimony refutes Ms. Iles' contention that she was exposed to harmful concentrations of particulate matter, we again point out that the trial court did not credit that testimony and instead relied on Dr. Mitchell to establish the likelihood of exposure and on Dr. Plunkett to establish causation. As noted by the trial court, Ms. Iles developed an immediate onset of symptoms.

We do, however, find error in the trial court's award of $5,000.00 for fear of future cancer. While Ms. Iles testified regarding her ongoing concerns, she did not offer specific testimony regarding a fear of cancer. Thus, there was no evidentiary basis for the determination that Ms. Iles had a credible fear of developing cancer in the future. We reverse that aspect of the award made to her as reflected in the decree rendered in the companion case of *Clarisse Armstead, et al. v. Multi-Chem Group, LLC, et al.*, 17-988 (La.App. 3 Cir. _/_/18), _ So.3d _.

Julia Tillman

Unlike the other plaintiffs, Ms. Tillman was traveling in her vehicle at the time of the explosion. She explained that as she and her daughter approached the area, they heard "a big boom." Ms. Tillman explained that they saw fire and smoke and that when they turned from the road there was "something coming in the car, like a fume." She explained that she instructed her daughter to turn off the air conditioner due to the fumes, but that when she arrived home, she could still smell the fumes. When asked whether she could see the smoke once she arrived home, Ms. Tillman explained that it looked like a cloud at that point.

48

Ms. Tillman testified that she became nauseated and, although not hurting, she felt poorly. She denied having any complaints prior to the exposure. Ms. Tillman explained that she became concerned with her condition when her symptoms lingered, particularly the first week. She stated that the symptoms eventually improved until they resolved after two weeks.

As with Ms. Iles, the trial court determined that Ms. Tillman was not in sufficiently close proximity to the explosion to have reasonably felt a fear for her safety. Furthermore, she did not evacuate her home or seek medical treatment. The trial court explained, however, that Ms. Tillman was "close enough to see and smell the smoke, both when riding nearby in her daughter's car and in her neighborhood once she arrived at home." It also observed that Ms. Tillman began experiencing physical symptoms upon smelling the smoke. Given those circumstances, the trial court determined that Ms. Tillman demonstrated her probable exposure to the particulate matter and associated chemicals. The trial court awarded $5,000.00 in general damages.

In their questioning of this award, the defendants maintain their assertion that Mr. Roberts' testimony suggested that the prevailing winds took the smoke plume away from Ms. Tillman's area. Again, however, the trial court rejected Mr. Roberts' testimony. Furthermore, the trial court credited Ms. Tillman's account of having smelled the smoke as well as her account of an immediate onset of symptoms. We thus maintain the $5,000.00 award in general damages.

However, and as with Ms. Iles, we find no evidentiary basis for the trial court's award of $5,000.00 for fear of developing cancer. While the trial court's reasons for ruling indicate that Ms. Tillman "did testify that upon learning that the origin of the fire and smoke was an explosion at a chemical plant, she became

fearful of contracting cancer." That finding is misplaced. Reference to the transcript instead indicates that, while other plaintiffs testified in that regard, Ms. Tillman did not. When asked whether she knew what type of chemicals Multi-Chem stored at its facility, Ms. Tillman explained that she did not. Neither was she asked specifically about a fear of developing cancer in the future. Rather, questioning regarding her concerns was general in nature. Given this lack of evidence, we reverse the trial court's award in this regard as reflected in the decree rendered in the companion case of *Clarisse Armstead, et al. v. Multi-Chem Group, LLC, et al.*, 17-988 (La.App. 3 Cir. _/_/18), _ So.3d _.

Michael Honore, Sr.

Mr. Honore explained that he was outside of his apartment home at the time of the explosion. He stated not only that he heard it, but that within minutes saw its smoke in his neighborhood. He also reported both smelling the smoke and developing a taste in his mouth. When asked about his injuries, Mr. Honore stated that he had an immediate onset of nausea, vomiting, dizziness, and headaches. He testified that the conditions lasted for weeks, but that he did not report for medical treatment as he did not have health insurance and instead simply visited the drugstore. He eventually evacuated to his aunt's home as he continued to feel ill. Mr. Honore explained that he did not know the type of chemicals involved in the explosion, but that he continued to have a fear regarding future illness due to what he breathed.

Finding that Mr. Honore was located approximately 2.1 miles from the Multi-Chem facility, the trial court concluded that he was not sufficiently close so as to have feared for his immediate safety following the explosion. However, observing that Mr. Honore heard the explosions and subsequently saw, smelled,

and tasted the smoke, the trial court concluded that he more probably than not was exposed to the particulate matter and chemicals carried by the smoke. Noting the immediate onset for physical symptoms, the trial court awarded $5,000.00 in general damages as well as $5,000.00 for fear of developing cancer.

We find no merit in the defendant's contention that Mr. Honore's testimony was fatally contradicted by the prevailing winds as testified to by Mr. Roberts. Again, that opinion testimony was not accepted. To the extent the defendants question Mr. Honore's testimony that smoke was all around him given his distance from the explosion, the trial court did not interpret the statement to mean that Mr. Honore was blanketed in the substance. Rather, the trial court interpreted the statement to be that he could see, smell, and taste the smoke over his neighborhood. It additionally noted his onset of physical effects. On review, we find that the record supports that credibility-based factual finding.

Adam Curley

Mr. Curley explained that he was at home when he heard a noise like an explosion. Mr. Curley denied seeing smoke immediately, but explained that he began to see a fog. Upon cross-examination by defense counsel, he denied seeing black smoke, but explained that he had covered his eye due to a prior eye injury. He explained that the exposure, however, made his eyesight worse and caused pain. Mr. Curley stated that he initially used clear water as treatment, but eventually used over the counter eye drops. His eye pain persisted for a month.

The trial court found that, at Mr. Curley's location 2.1 miles from the Multi-Chem facility, he did not have reasonable fear for his immediate safety. The trial court further found that, although there was no evidence that Mr. Curley had sustained additional injury to his pre-existing eye condition, he was close enough

to corroborate his complaints of eye irritation and headaches. The trial court noted that other witnesses shared similar complaints upon exposure. Thus, the trial court concluded that it was more probable than not that Mr. Curley experienced physical discomfort due to exposure to the fire's substances, "whether such discomfort was a new symptom or simply the aggravation of his pre-existing eye condition." The trial court awarded $5,000.00 in general damages and awarded an additional $5,000.00 for fear of developing cancer.

We find no abuse of discretion in the trial court's shaping of general damages to Mr. Curley. Like other plaintiffs, he reported seeing white fog and testified regarding an immediate onset of symptoms. While the defendants suggest that Mr. Curley's testimony regarding white smoke was contrary to other testimony regarding black smoke, we note that the trial court interpreted his testimony to indicate that he saw a haze. We find no manifest error in that conclusion, nor the surrounding credibility determination. Further, the trial court found favor in Dr. Plunkett's testimony regarding causation of that type of symptom reported by Mr. Curley, as well as Dr. Mitchell's testimony regarding the spread of the smoke over the general area.

We do, however, reverse the trial court's award of $5,000.00 for fear of developing cancer. Counsel did not pose questions to Mr. Curley regarding fear of cancer nor did he testify in that regard. In light of that lack of evidence, we reverse the trial court's award in this regard as reflected in the decree rendered in the companion case of *Clarisse Armstead, et al. v. Multi-Chem Group, LLC, et al.*, 17-988 (La.App. 3 Cir. _/_/18), _ So.3d _. However, we maintain the remainder of the award to Mr. Curley.

Dorothy Lopez

Mrs. Lopez explained that she was in the backyard of her home planting tomatoes and picking fruit from her tree at the time of the explosion. She stated that she saw a lot of smoke being put out from the facility, and that because she was unaware of the danger, she began to pick figs from her tree, "eating them right then and there." However, after she "had [her] stomach full," she realized that she had a dry, bitter taste in her mouth. She further testified that, after learning more about the explosion, she disposed of the tomatoes and figs that she had already picked as she had concerns regarding the safety of eating them. Mrs. Lopez ultimately visited her physician, reporting the dry taste in her mouth and an unsettled stomach.[24] She explained that by the time she visited the physician again in August 2011, she was feeling better.

The trial court found that Mrs. Lopez's home was not within close enough proximity so as to support an award for immediate fear for her safety. However, the trial court observed that Mrs. Lopez had various fruits and vegetables in her yard and that her "experience when eating the fruit soon after the Multi-Chem fire leads this court to find that, more probable than not, the vegetation in Mrs. Lopez's backyard was exposed to the particulate matter and chemicals carried by the plume of smoke[.]" The trial court therefore awarded Mrs. Lopez $2,500.00 in general damages, as well as $73.00 in medical expenses. The trial court awarded an additional $5,000.00 for fear of developing cancer.

---

[24] Mrs. Lopez's medical records indicate that she actually reported to her physician on June 24, 2016 and reported having eaten two figs the day earlier. The handwritten notation indicates that she reported not "know[ing] we couldn't eat off of fig tree and out of my garden."

In their brief, the defendants' question the variation in the accounts of Mrs. Lopez having eaten the fruit from her tree on the day of the explosion or whether she consumed the fruit immediately before reporting to her physician on June 24th. We find no real import in this distinction given Mrs. Lopez's testimony that she may have failed to recall the sequence of events correctly at the time of trial due to her memory. The trial court instead interpreted the evidence to be that Mrs. Lopez's symptoms began "when she ate a fig off of the tree in her back yard within days of the fire." This finding is consistent with Mrs. Lopez's overall testimony.

We do, however, find that the trial court's award for fear of developing cancer is not supported by the record. While she explained that she had, in fact, been diagnosed with lung cancer at some point in the past,[25] she did not testify that she has a fear of developing cancer in the future as a result of this exposure. Given that lack of evidence, we reverse the trial court's award in this regard as reflected in the decree rendered in the companion case of *Clarisse Armstead, et al. v. Multi-Chem Group, LLC, et al.*, 17-988 (La.App. 3 Cir. _/_/18), _ So.3d _. However, we maintain the remainder of the award to Mrs. Lopez.

**Category 3 (located more than three miles from the fire source)**

John Lopez, Sr.

The trial court noted that Mr. Lopez was at his home, located approximately two and a half miles[26] from the Multi-Chem facility, at the time of the explosion. Mr. Lopez explained that when he entered his yard in order to tend to his garden, his eyes began burning and watering. He also explained that he detected a smell

---

[25] Mrs. Lopez made no claim of causation of her earlier occurring cancer diagnosis.

[26] Notwithstanding this finding as to distance, Mr. Lopez was designated as a bellwether plaintiff for Category 3. We note too that Mrs. Lopez was designated a bellwether plaintiff for Category 2.

and that, when he looked up and saw dark colored smoke, he became frightened and returned to the house. Once inside, he began trying to wash his eyes. As noted, Mr. Lopez was evaluated by Dr. Rizzo for primary complaints of eye irritation and burning with excessive tearing. Dr. Rizzo explained that Multi-Chem had a number of chemicals in its inventory that could cause those symptoms.

Awarding $2,500.00 to Mr. Lopez in general damages, the trial court first found that he was not in close enough proximity to the explosion and fire to have an immediate threat for his safety. However, the trial court determined that Mr. Lopez was sufficiently close to the fire to have seen its smoke, ultimately concluding that he was more probably than not exposed to the particulate matter and chemicals carried by that plume of smoke. As with Mrs. Lopez, the trial court found it likely that those substances settled on the vegetables in their garden. The trial court further awarded Mr. Lopez $239.75 incurred in medical expenses as well as $5,000.00 for fear of developing cancer.

In challenging the award, the defendants maintain their argument that the smoke plume did not move in the direction of the Lopez home. As addressed above, however, the trial court did not accept the defendants' expert testimony regarding the direction of the fire. Like other plaintiffs, Mr. Lopez explained that he detected an odor and suffered an immediate onset of symptoms so as to support the trial court's opinion regarding exposure. Additionally, Dr. Rizzo confirmed the causation of Mr. Lopez's symptoms. Further, Mr. Lopez explained that he had concerns as he did not know what the contents of the smoke could do to his future health. Accordingly, we maintain the trial court's award to Mr. Lopez.

55

<u>Clarisse Armstead</u>

Unlike the other bellwether plaintiffs, Ms. Armstead explained that she remained inside on the day of the explosion. However, she went onto her porch the following morning, where she saw "something that looked like dark. It was cloudy but not as weather cloudy, but cloudy because of the smoke." Ms. Armstead explained that she identified a strong smell. She testified that it went into her throat and that she began feeling bad, experiencing itching, nausea, and headache. She explained that she had experienced asthma the day before, but that it worsened. Although she did not seek medical treatment immediately, Ms. Armstead eventually reported to the emergency room as she still felt ill and was frightened. She was diagnosed with bronchitis. Ms. Armstead explained that, although her symptoms improved two weeks after visiting the emergency room, her asthma has not improved.

Pointing out that Ms. Armstead was located approximately 3.8 miles southeast of the Multi-Chem facility, the trial court found that Ms. Armstead did not have a reasonable fear for her immediate safety. However, the trial court found it more probable than not that symptoms reported by Ms. Armstead were caused by exposure to lingering particulate and chemicals carried by the smoke from the Multi-Chem fire, "whether or not those symptoms were new or simply an aggravation of her pre-existing asthma." Thus, the trial court awarded $2,000.00 in general damages. The trial court did not award medical expenses, noting a lack of documentation in that regard. Finally, the trial court awarded an additional $2,000.00 for fear of developing cancer.

We again find no merit in the defendants' claim on appeal that Ms. Armstead was located in an area unaffected by the smoke plume. Instead, Dr.

Mitchell explained that his interpretation of the radar imagery indicated that the plume moved to the south and east. Also, while the defendants suggest that Ms. Armstead did not see smoke from the explosion insofar as she was inside, she further explained that she saw and smelled smoke the following morning. Recall that the fire burned until the following day. Additionally, she felt an immediate onset of symptoms, which she explained were not resolved until several weeks later. Accordingly, we maintain the trial court's award of general damages.

However, we find no basis for the trial court's award of $2,000.00 for fear of developing cancer. Counsel did not pose questions in that regard to Ms. Armstead nor did she offer testimony in that regard. Given that absence of evidentiary support, we reverse the trial court's award in this regard as reflected in the decree rendered in the companion case of *Clarisse Armstead, et al. v. Multi-Chem Group, LLC, et al.*, 17-988 (La.App. 3 Cir. _/_/18), _ So.3d _.

In sum, and in concluding this assignment of error, we find support for the trial court's awards for general damages to each of the bellwether plaintiffs as well as for its award of special damages to a number of plaintiffs. Accordingly, we leave those awards undisturbed. We further maintain the trial court's award for mental anguish resulting from fear of developing cancer made to seven of the bellwether plaintiffs, but reverse the five awards for which there was no evidentiary basis.

**DECREE**

For the foregoing reasons, and except as reflected in the decrees of the companion matters in these consolidated appeals, the judgment of the trial court is affirmed. Costs of this proceeding are assessed to the defendants-appellants,

Multi-Chem Group, LLC, Cade Bourque, John Gauthier, Nathan Walker, and Aaron Gauthier.

**AFFIRMED.**